**UNITED STATES DISTRICT COURT UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Anthony Delgado, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:20-cv-03271 |
| v. | ) | |
| | ) | |
| Chicago Water and Fire Restoration, | ) | Hon. Harry D. Leinenweber |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S R 56.1 STATEMENT
OF UNCONTESTD MATERIAL FACTS & STATEMENT OF
ADDITIONAL MATERIAL FACTS**

Pursuant to Local Rule 56.1, Plaintiff Anthony Delgado ("Plaintiff", "Delgado"), through his

counsel, submits this Response to Defendant's Local Rule 56.1 Statement of Uncontested

Material Facts, and his Statement of Additional Material Facts.

**A.      Relevant POWER DRY Policies and Procedures.**

1.      Power Dry, a company providing water and fire damage restoration to

commercial and residential customers, is an equal opportunity employer.  It maintains clear

policies that prohibit discrimination and provide that employment decisions will be made

without regard to an individual's disability or any other protected characteristic.  (Power Dry

Employment Handbook, page 7).

**Plaintiff does not contest that Defendant's Employment Handbook contains EEO and
Anti-Discrimination/Harassment Policy. Otherwise contested.**

2.      Power Dry's policies further indicate that it makes reasonable accommodations when necessary for all employees and/or applicants with disabilities, provide the individual is otherwise qualified to perform the essential functions of the job.  (Power Dry Employment Handbook, page 8)

**Plaintiff does not contest that Defendant's Employment Handbook contains EEO and Anti-Discrimination/Harassment Policy. Otherwise contested.**

3.      Power Dry's policies and procedures on attendance provides that employees are expected to arrive to work on time and as scheduled or assigned.  Power Dry managers have discretion to evaluate the circumstances of an absence, tardy, or early departure, and determine whether or not to count the incident as a violation of Power Dry's policies and procedures. (Power Dry Employment Handbook, page 10)

**Contested in that the policy in the Handbook page 10 applies to salaried employees and that Plaintiff was paid hourly.**

4.      An employee is deemed absent by Power Dry when the employee is unavailable for work as scheduled or assigned.  (Power Dry Employment Handbook, page 10).

**Contested in that the policy in the Handbook page 10 applies to salaried employees and that Plaintiff was paid hourly.**

5.      An employee is deemed unexcused absent by Power Dry when the employee is unavailable for work assigned or scheduled and the time off:  (1) was not scheduled or approved in advance following Power Dry notification; or (2) is not supported through medical documentation.  (Power Dry Employment Handbook, page 10)

**Contested in that the policy in the Handbook page 10 applies to salaried employees and that Plaintiff was paid hourly.**

6.      An employee is deemed tardy for work by Power Dry when the employee is 15 minutes late on a day scheduled or assigned to work.  (Power Dry Employment Handbook, page 10).

**Contested in that the policy in the Handbook page 10 applies to salaried employees and that Plaintiff was paid hourly.**

7.      If a Power Dry employee is deemed unexcused absent or tardy, or have an unexcused early departure, the employee's supervisor can begin the disciplinary process to include verbal and/or written warnings, unpaid suspension, deductions from salary and/or commissions, and termination.  (Power Dry Employment Handbook, page 12).

**Contested in that the policy in the Handbook page 12 applies to salaried employees and that Plaintiff was paid hourly.**

8.      Plaintiff, Anthony Delgado, ("Delgado"), received a copy and had access to all Of Power Dry's employment related policies.  (Delgado Deposition, page 131:10-11)

**Plaintiff does not contest that Plaintiff testified that he received Defendant's Employment Handbook.  Otherwise contested. Plaintiff further states that Plaintiff signed acknowledging the receipt of the Handbook on July 30, 2018, a year after his employment began. (Def. Ex. 1, Employment Handbook, pp. 78-79).**

B.      <u>**The Business of Power Dry.**</u>

9.      Power Dry is in the business of disaster restoration and rehabilitation to both consumer and commercial customers.  This commonly includes clean up and restoration after fires, flooding, burst piped [sic], etc.  (Plaintiff's Complaint, ¶ 10).

**Plaintiff does not contest.**

10.     In servicing its customers, Power Dry will typically send "crews" to the affected

locations.  A crew will consist of one "crew chief" and several "helpers."  (Plaintiff's

Complaint, ¶ 11)

**Plaintiff does not contest.**

11.     "Helpers" at Power Dry are paid an hourly rate for hours of work performed.  (Plaintiff's

Complaint, ¶ 11).

**Plaintiff does not contest.**

12.     Power Dry on average has 10 to 15 helpers.  (Power Drive Vice President, Kseniya

Kelly Deposition, Page 28:14-16)

**Plaintiff does not contest but clarifies that Defendants had 10-15 mitigation helpers. *Id.***

13.  "Crew Chiefs" supervise and train the helpers at Power Dry.  (Kelly Deposition, pages

14-15:24, 1-2; page 18:1-5).

**Plaintiff does not contest.**

14.     While helpers are paid an hourly rate, crew chiefs are paid a commission for each

job completed and are paid more than helpers.  (Plaintiff's Complaint, ¶ 12).

**Plaintiff does not contest.**

15.     Crew chiefs' salaries are strictly commission-based.  (Kelly Deposition, Page 50:5-11)

**Plaintiff does not contest.**

**C.     Delgado's Time at Power Dry.**

16.     Delgado was hired by Power Dry in 2017 as an "on-call helper" or "1099 temporary laborer." (Plaintiff's Complaint, ¶ 7-14; Delgado Deposition, pages 25-26: 23-24, 1; Kelly Deposition, pages 10-11:23-24, 1-12).

**Plaintiff does not contest.**


17.     His job duties during his time as a temporary laborer, according to Delgado, were to "assist the team." He testified that he would "run the garbage" and "clean up the mess" to "assist the crew chief and the helper." (Delgado's Deposition, Page 26:10-21).

**Plaintiff does not contest.**

18.     Kseniya Kelly describes his time in this role as helping the company on an as-needed basis. He would come in when he was available and the company needed help. (Kelly Deposition, Page 12:4-7)

**Plaintiff does not contest.**

19.     Delgado was an on-call helper for around three months before being promoted to the position of "mitigation apprentice" or "helper." (Delgado's Deposition, Page 29:9-16; Kelly Deposition, Page 12:8-15).

**Plaintiff does not contest that he became a full-time employee but contests that the change constitutes promotion.**

20.     Upon being promoted to mitigation helper, Delgado became a full-time employee of Power Dry. (Delgado's Deposition, Page 31:11-13).

**Plaintiff does not contest that he became a full-time employee but contests that the change constitutes promotion.**

21.     During Delgado's employment as a helper at Power Dry, he was paid $15 an hour

plus overtime (time and a half) beyond 40 hours per week.  (Kelly Deposition, page 20:3-7).

**Plaintiff does not contest.**

### D.     <u>Power Dry's  Paym en t  o  Help ers.</u>

22.     Almost all mitigation helpers were paid $15 per hour with the exception of two

individuals who were paid $16 per hour.  One was Matthew Nelson and the other was

Jonathan Coats.  (Kelly Deposition, pages 20-21:18-24,1-4).

**Plaintiff does not contest that that is Kelly's testimony but contests that there were only two individuals who were paid $16 per hour. According to Defendant's records, Robert Ocasio, another Helper, was initially getting paid at $15 per hour but later was getting paid at $16 per hour. See Plaintiff's Additional Statement of Facts (PASF), ¶ 40.**

23.     Power Dry employed 43 other mitigation helpers during Delgado's period of

employment, all of whom, with the exception of those who were promoted, remained at the

salary of $15 per hour until their resignation or termination.  (Defendant's Answers to

Plaintiff's Interrogatories).

**Plaintiff contests because Robert Ocasio, another Helper, was initially getting paid at $15 per hour but later was getting paid at $16 per hour according to Defendant's records.  PASF, ¶ 40.**

24.     Nelson was paid $16 per hour because he was certified to operate a forklift and, a

specialized skill needed at Power Dry.  Coats was paid $16 per hour because he used to have

his own restoration company and had extensive experience and training in mitigation services

of all aspects.  Coats was also certified through the Institute of Inspection, Cleaning and

Restoration. (Kelly Deposition, Page 21-22: 14-24, 1-3).

**Plaintiff does not contest that this is what Kelly testified to during the Rule 30(b)(6) deposition, but contests that only Nelson and Coast were paid $16 per hour because Ocasio's pay increased from $15 per hour to $16 per hour. PASF, ¶ 40.**

25.    It is Power Dry's policy to not give raises to mitigation helpers.  (Kelly Deposition,

Page 23:2-14, Power Dry General Manager, John Montalbano Deposition, Page 23:1-4).

**Plaintiff does not contest that this is what Kelly testified to during the Rule 30(b)(6) deposition, but contests otherwise because there was a Helper whose hourly rate was increased. PASF, ¶ 40.**

**E.     Promotion to Crew Chief, Generally**

26.    While many helpers are promoted to crew chief, that is not always the case.  (Delgado's

Deposition, Page 44:10-18).

**Plaintiff contests to the extent this statement misconstrues witness testimony.**

27.    Helpers, according to Kelly, have to meet company expectations in order to be

eligible for promotion to the position of Crew Chief.  (Kelly Deposition, Page 29:12-15)

**Plaintiff does not contest that this is what Kelly testified to during the Rule 30(b)(6) deposition, but contests otherwise. Defendant does not have any written policy or standard for promotion and promotion is usually given spontaneously within one year after a Helper is hired. See PASF, ¶¶1, 13-16.**

28.    According to Montalbano, helpers are evaluated for promotion based on their

employment record, personnel record, eagerness, drive, responsibility, recommendations

upon crew chiefs, and willingness of the employees.  (Montalbano Deposition, Page 11:6-

17).

**Plaintiff does not contest that this is what Montalbano testified to during the deposition, but contests otherwise. Defendant does not have any written policy or standard for promotion and promotion is usually given spontaneously within one year after a Helper is hired. See PASF, See PASF, ¶¶1, 13-16.**

29.     Kelly has testified that sometimes helpers come and ask for promotions. She further stated that Power Dry will identify a person for promotion if they see the person as hard-working, shows up every time, has face time with the management during the company meetings, and the crew chief speaks highly of them when asked. (Kelly Deposition, Pages 30-31:22-24).

**Plaintiff does not contest that this is what Kelly testified to during the Rule 30(b)(6) deposition, but contests otherwise because Defendant does not have any written policy or standard for promotion and promotion is usually given spontaneously within one year after a Helper is hired. See PASF, ¶¶ 1, 13-16. Plaintiff further states that attending meetings did not affect eligibility for promotion to the crew chief position because the Defendant did not consistently discipline or disqualify Helpers when they were late for the meetings or missed them entirely. See PASF, ¶¶ 18, 22-25.**

30.     Kelly has also testified that length of employment is not a consideration regarding promotion. (Kelly Deposition, Pages 31-32:23-24, 1)

**Plaintiff does not contest that this is what Kelly testified to during the Rule 30(b)(6) deposition, but contests otherwise. Plaintiff further states that it is a general practice of the Company to promote Helpers within a year based on Defendant's own records and witness testimonies. See PASF, ¶¶ 13-16.**

31.     Promotion from helper to crew chief can take anywhere from six months, to two years according to Kelly. She has further testified that it depends on whether the person came with experience already or whether the person showed outstanding work performance and attendance. (Kelly Deposition, Page 32:2-8)

**Plaintiff does not contest that this is what Kelly testified to during the Rule 30(b)(6) deposition, but contests otherwise. Plaintiff further states it is a general practice of the Company to promote Helpers within a year based on Defendant's own records and witness testimonies. See PASF, ¶¶ 13-16.**

**F.     Delgado's Time at Power Dry**

32.     Upon hire, Delgado believed he would be promoted to crew chief based on his friend

and co-worker telling him he could be promoted within three months.  (Delgado Deposition,

Page 14:1-14, pages 16-17:1-24, 1-9).

**Plaintiff objects to this statement because it contains a hearsay. Plaintiff contests to the
extent that this statement misconstrues the testimony because Plaintiff was merely
explaining the reason why he applied for the Company. (Delgado Deposition, Page 14:1-
14).**

33.     Power Dry's general manager, John Montalbano supervised Anthony Delgado, made

sure he was clocking in and clocking out and that he was being responsible as an employee.

(Montalbano Deposition, Page 10:11-20).

**Plaintiff contests this statement because it misstates the witness's testimony. Montalbano
testified that he supervised Plaintiff in only certain areas of work such as making sure
that he was clocking in and clocking out and that he was being responsible as an
employee. Crew Chiefs are the direct supervisors of Helpers.**

34.     Montalbano discussed with Delgado several times, topics that he needed to be

working on for his employment, including responsibility, showing up to meetings, being on

time for meetings, and clocking in and clocking out.  (Montalbano Deposition, Page 23:10-

18)

**Plaintiff does not contest that this is what Montalbano testified to during the
deposition, but contested that Plaintiff was not warned or disciplined for the alleged
conduct described by Montalbano.  See PASF, ¶¶ 33-34.**

35.     Montalbano has stated that an employee's disciplinary record is looked into when

considering whether to promote helpers to crew chief.  (Montalbano Deposition, Page 33:3-5)

**Plaintiff does not contest that this is what Montalbano testified to during the
deposition, but otherwise contested. Plaintiff further states that most of the disciplinary
actions against Plaintiff identified by Defendant in this lawsuit are not supported by
written evidence and were not included in the personnel file Defendant produced in
violation of the Illinois Personnel Record Review Act. See PASF, ¶ 32.**

36.    Had Delgado ever directly requested a promotion to Montalbano, according

to Montalbano, his answer would have been no due to his personnel record.

(Montalbano Deposition, Page 35-36:16-24, 1-2)

**Plaintiff does not contest that this is what Montalbano testified to during the
deposition, but contests otherwise. The text message communications between Plaintiff
and Montalbano clearly shows that Plaintiff had requested to be considered for
promotion and asked Montalbano why he was not being promoted. See PASF, ¶¶ 11-
12.**

37.    The reason he was not promoted, according to Montalbano, was because he missed

too many weekly meetings, failed to follow directions, and did not present himself

appropriately by cursing a lot while working.  (Montalbano Deposition, Page 36:13-23).

**Plaintiff does not contest that this is what Montalbano testified to during the deposition,
but contests otherwise. Plaintiff further states that Defendant declined to discipline
Helpers who did not attend a meeting and selectively disciplined Plaintiff. The
importance of attending meetings when it comes to promotion is exaggerated by
Defendant to justify its action not to promote Plaintiff. See PASF, ¶¶ 18, 22-26,38-39.**

38.    Kseniya Kelly testified that Delgado had multiple attendance issues and was unreliable.

(Kelly Deposition, Page 65:22-24).  There was also a worry, according to Kelly, that he did

not filter his very inappropriate language.  (Kelly Deposition, Page 66:1-3).

**Plaintiff does not contest that this is what Kelly testified to during the deposition, but
contests otherwise. Plaintiff further states that Kelly failed to provide any specific
examples of Mr. Delgado's inappropriate language other than the fact that he once
texted Mr. Montalbano that "I think I broke my ass bone," after falling at the company
premises. (Defendant's Exhibit D, 30(b)(6) Deposition, 34:8-35:7). Plaintiff further
states that he was not warned or disciplined for his alleged inappropriate language use.
See PASF, ¶ 34.**

39.    To identify a specific example, Kelly testified that on one occasion Delgado was

absent without informing management, and told his crew chief to use another person that day

whom his crew chief was under the impression was an employee of Power Dry.  The person

was not an employee and ended up working that day without Power Dry's approval,

unbeknownst to management until later. (Kelly Deposition, Page 66-67:4-24, 1-14).

**Plaintiff does not contest that this is what Kelly testified to during the deposition, but contests otherwise. Plaintiff further states that this conduct is not in violation of the company policy. It is a general and acceptable practice for an employee to send in his replacement when he could not work and there is no company approved on call list. It is Operation Manager, Trevor Madera's responsibility to find a replacement, not Plaintiff's. Defendant admitted that Plaintiff did not have the alleged approved list he was supposed to use to find a replacement. PASF, ¶¶ 35-36.**

40.     Kelly has also testified that each documented missed appointment or missed company

meeting, was an example of Delgado not following company directions. (Kelly Deposition,

Page 36:19-24).

**Plaintiff does not contest that this is what Kelly testified to during the deposition, but contests otherwise. Defendant did not consistently disciplined Helpers who were late for or missed meetings. PASF, ¶¶ 22-25.**

41.     The written warnings Delgado received for missed meetings, according to Kelly, were

crucial, not just to promotion but to employment in general. (Kelly Deposition, Page 58:13-

18)

**Plaintiff does not contest that this is what Kelly testified to during the deposition, but contests otherwise. Plaintiff further states that Defendant failed to discipline Helpers who did not attend a meeting and selectively disciplined Plaintiff. PASF, ¶¶ 22-26. Attending meetings did not affect eligibility for promotion to the Crew Chief position. *Id*., ¶18.**

42.     Kelly has further testified that the weekly meetings are important to give updates to

employees since they aren't seen on a regular basis when they are out in the field. The

training at these meetings involves safety training and new equipment training. Both crew

chiefs and helpers are required to attend the meetings. (Kelly Deposition, Page 52-53:12-24,

1-7).

**Plaintiff does not contest that this is what Kelly testified to during the deposition, but contests otherwise. Plaintiff further states that Defendant failed to discipline Helpers**

**who did not attend a meeting and selectively disciplined Plaintiff. The importance of attending meetings when it comes to promotion is exaggerated by Defendant to justify its action not to promote Plaintiff. See PASF, ¶¶ 22-26   In the meeting, the administrative issues in the Company and customer complaints are discussed. Safety issues were not the main topics of the meetings and were not frequently discussed. See PASF, ¶ 17.**

43.     When meetings are missed, according to Kelly, Power Dry employees face progressive discipline.  There is a system of warnings.  The employees are issued written warnings stating that they are expected to come to the meetings, that their absences are not excused, and that further instances could result in further disciplinary action, up to and including termination. (Kelly Deposition, Page 53:8-17)

**Plaintiff does not contest this is what Kelly testified to during the deposition, but contests otherwise. Plaintiff further states that Defendant did not follow its progressive discipline policy and selectively disciplined only certain Helpers who missed or were late for meetings. See PASF, ¶¶ 22-26.**

44.     After an employee receives a final warning, which usually follows two to three

warnings, the next step is termination.  (Kelly Deposition, Page 54-55:21-24, 1-2)

**Plaintiff does not contest that is what Kelly testified to during the deposition.**

**G.      Delgado's Disability**

45.     Delgado suffers from epilepsy and has experienced seizures.  (Delgado's Deposition,

Pages 18-19:24, 1-7)

**Plaintiff does not contest.**

46.     Because of Delgado's epilepsy, he is not able to drive.  (Delgado's Deposition, Pages

21:13-15).

**Plaintiff does not contest.**

47.     Power Dry was aware that Delgado suffered from epilepsy during his employment,

beginning in March 2018.  (Montalbano Deposition, Page 27:4-6, Kelly Deposition, Page

59:19-22).

**Plaintiff does not contest.**

48.     Delgado suffered a seizure during a company meeting in March of 2018, which made

Power Dry management aware of his condition of epilepsy.  (Montalbano Deposition, Page 26-

27:14-24, 1-6; Kelly Deposition, Page 59-60:19-24, 1-3).

**Plaintiff does not contest.**

49.     Delgado's disability does not allow him to get a driver's license and therefore he cannot

drive a motor vehicle.  (Delgado's Deposition, Page 71: 9-14)

**Plaintiff does not contest.**

50.     There were other employees at Power Dry who were promoted to the position of crew

chief who did not have drivers' licenses.  (Delgado Deposition, Page 46-47:5-24, 1-3; Page

70:20-23; 73:10-12; 87:3-11; 88:8-13).

**Plaintiff does not contest. Plaintiff further states that one of the reasons given by the
company to Plaintiff when he asked Montalbano why he was not promoted was that
he did not have a driver's license. PASF ¶ 5. Defendant admitted that Plaintiff's
inability to drive was one of the reasons why he was not promoted during the EEOC
procedure but abruptly changed its position in this lawsuit. PASF ¶¶ 7-8.  The
employees who were promoted to Crew Chief were not disabled. PASF ¶ 10.**

51.     Delgado therefore understood, that the reason he was not promoted to crew chief, had

nothing to do with his not being able to obtain a driver's license.  (Delgado Deposition, Page

71:15-22, 73:5-16).

**Plaintiff contests because this statement misconstrues his testimony. Plaintiff
testified that he did not believe the company's explanation that his inability to obtain**

**a driver's license was the reason why he was not being promoted because the company promoted other non-disabled employees without a driver's license to crew chief. After non-disabled Helpers without a driver's license were promoted, Plaintiff asked Montalbano what made him different from them and expressed that his diagnosis is the reason why he was treated differently. PASF ¶ 11-12.**

52.     Delgado states that he "would not be able to say" why he was not promoted and can

provide no basis supporting his allegation that it was because of his disability other than to

say other employees without disabilities were promoted. (Delgado Deposition, Page 55:1-11,

Page55:22-24, 56:1-11).

**Plaintiff contests because this statement misconstrues his testimony. Plaintiff clearly testified that non-disabled Helpers who did not have driver's licenses were promoted but he was not being promoted even though Defendant explained to him that the reason why he was not promoted was because he did not have a driver's license.**

**H.      Delgado's Write-Ups**

53.     On August 1, 2018, Delgado was written up by Power Dry when he was late for a

7:30 a.m. meeting without any notice to management. Delgado's write-up from that date

further stated, "moving forward Anthony needs to follow all Power Dry SOPs ("Standard

Operating Procedures"). Failure to do so will result in further disciplinary action up to and

including termination. (Delgado Deposition, Page 113-114:2-24, 1-13, August 1, 2018 write-

up).

**Plaintiff does not contest that he received a write-up. However, Plaintiff states that Defendant's disciplinary actions against employees who were late for the meetings or missed the meetings were arbitrary and were not consistent, and that Plaintiff was selectively disciplined. PASF ¶¶ 22-26.**

54.     On October 17, 2018, Delgado failed to attend the weekly department meeting and as

a result received a written warning from Power Dry. (See October 17, 2018 write-up)

**Plaintiff contests admissibility and credibility of this document because the write up was not signed by any of the managers. See Def. Ex. H [Doc # 26-8]. Plaintiff further states that Defendant's disciplinary actions against employees who were late for the**

**meetings or missed the meetings were arbitrary and were not consistent. PASF ¶¶ 22-26.**

55.    On November 7, 2018, Delgado received a written warning for being late to a

department meeting.  (Delgado Deposition, Pages 127-128:18-24, 1-11; November 7, 2018

write-up)

**Plaintiff does not contest that he received a write-up. However, Plaintiff states that Defendant's disciplinary actions against employees who were late for the meetings or missed the meetings were arbitrary and were not consistent. PASF ¶¶ 22-26.**

56.    On February 20, 2019, Delgado missed a meeting and admitted that it was because

he slept through his alarm.  He admitted that this had nothing to do with his disability.

(Delgado Deposition, Page 104:10-20 and page 111:18-24).

**Plaintiff does not contest that he missed the meeting on that day but further states that he did not receive any write-up for missing the meeting on February 20, 2019.**

57.    On May 15, 2019, Delgado received a written warning for failing to show up for the

weekly Power Dry Crew Chief meeting without notice.  (See May 15, 2019 write-up).

**Plaintiff does not contest that he received a write-up. However, Plaintiff states that Defendant's disciplinary actions against employees who were late for the meetings or missed the meetings were arbitrary and were not consistent. PASF ¶¶ 22-26. Plaintiff was the only one who was written up for missing this meeting even though there was another Helper who missed the meeting. PASF ¶¶ 24-25.**

58.     On September 14, 2019, Delgado received a written warning after he failed to work his

scheduled shift and did not let dispatchers know of his absence.  (See September 14-15, 2019

write-up).

**Plaintiff contests because this statement is not relevant to Plaintiff's claim. Plaintiff filed his discrimination charge on May 24, 2019, challenging Defendant's adverse employment action of not promoting him and not giving him a raise. PASF ¶ 30. Any subsequent disciplinary actions by Defendants are not relevant and are retaliatory.  Plaintiff further contests because he informed a Crew Chief of his unavailability and found a replacement helper who would fill in for him pursuant to the company's usual practice. PASF ¶ 35-36. Plaintiff further states that finding a replacement was not his responsibility, but Operation Manager Trevor Madera's. *Id.***

59.     On October 23, 2019, Delgado received a written warning for being late without notice to a Power Dry meeting.  (See October 23, 2019 write-up).

**Plaintiff contests because this statement is not relevant to Plaintiff's claim. Plaintiff filed his discrimination charge on May 24, 2019, challenging Defendant's adverse employment action of not promoting him and giving him a raise. PASF ¶ 30. Any subsequent disciplinary actions by Defendants are not relevant and are retaliatory. Plaintiff further states that Defendant's disciplinary actions against employees who were late for the meetings or missed the meetings were arbitrary and were not consistent. PASF ¶¶ 22-26.**

## Plaintiff's Statement of Additional Facts under Rule 56.1 (b)(3)(c)

1.  Defendant does not have any written procedure or standard for promoting a Helper to a Crew Chief. Def. Ex. F, Montalbano Transcript [Doc # 26-6], 32:10-15.

2.  Defendants does not conduct performance reviews on Helpers regarding their work. *Id.*, 30:7-11.

3.  Plaintiff approached John Montalbano, a manager of Defendant in mid-2018, asking about a raise and promotion to a crew chief. Def. Ex. B, Delgado Transcript, 65:4-66:12.

4.  From then on until February 2019, Delgado had multiple meetings and text messages with Montalbano regarding a raise and promotion. Def. Ex. F, 16:20-18:17, **Ex. A**, **Text Messages between Plaintiff and Montalbano. Page 119.**

5.  During these conversations, Montalbano told Plaintiff that he was not promoted because he was working too much overtime and that he was not able to get his driver's license. **Ex. A, Page 119,** and Def. Ex. B, 68:6-69:10.

6. During the EEOC procedure, Defendant for the first time stated that Plaintiff was not promoted because he missed the company meetings and failed to clock in and out. **Ex. B, Defendant's EEOC Position Statement**, pp. 2-4.

7. Defendant also admitted in its position statement to the EEOC that "[A]nother issue for CWAFR that prevents Delgado from being promoted is that its Crew Chief's job duties include driving the company assigned vehicle to job sites and transport the required materials to customer's homes…Delgado is not able to obtain a driver's license because his epilepsy and therefore even if he did exemplify the workmanship required of a crew chief, he could not be promoted without a valid driver's license pursuant to company policy." ***Id***, p. 5.

8. In the position statement, Defendant further stated allowing Plaintiff to become a Crew Chief "would pose an undue burden to Defendant because promoting him would mean he would need to be provided transportation to job sites, meaning an additional employee with driving privileges, i.e., a Crew Chief, would have to transport Plaintiff to each site." ***Id.*** p. 11.

9. Defendant had at least two non-disabled Crew Chiefs who did not have driver's licenses and it assigned drivers for them. When Plaintiff asked whether he could be promoted to a Crew Chief and have a driver assigned for him like them, Montalbano told Plaintiff they had drivers because they were already crew chiefs when their driver's licenses were revoked. Def. Ex. B, 47:7-15, **Ex. A**, **Page 118**, **Ex. C, Delgado Affidavit, ¶ 8.**

10. However, in February 2019, Defendant also promoted Helpers who did not have a driver's license to the Crew Chief position contrary to Defendant's claim. The helpers were Julio Lopez and Corey Madison, and they were not disabled**. Ex. C,** ¶ 9.

11. After Lopez and Madison were promoted, Plaintiff texted Montalbano and asked why he was treated differently because those promoted Helpers were hired around the time he was hired. Plaintiff also expressed that he believes that his epilepsy diagnosis was the reason why he was treated differently. **Ex. A, p. 18.**

12. Montalbano did not respond and only stated that "[M]y one thing is not about money. It's about the company." ***Id.***

13. Mitigation Department Helpers are promoted to Crew Chief based on the company's need. Def. Ex. F, 32:19-33:2. Mr. Michael Love and Mr. Joseph Oweina testified that they were promoted to Crew Chief rather spontaneously and that the Company usually promotes helpers to Crew Chief 5 to 7 months after they are hired or within one year at the lates**t. Ex. D, Joe Oweina Affidavit, ¶¶ 5-6, Ex. E, Michael Love Affidavit, ¶¶ 4-5, 8.**

14. According to Defendant's Interrogatory Response, out of 28 helpers who were employed during Mr. Delgado's employment, 13 of them were promoted to Crew Chief within 5 months after they were hired as a mitigation department helper. Def. Ex. E [Doc # 26-5], Defendant's Interrogatory Response No. 3, **Exhibit F, Summary of Interrogatory Response No. 3 Data.** The rest of them, except for two helpers, were all promoted to Crew Chief within one year. ***Id.***

15. According to the data Defendant produced during the EEOC proceedings while Mr. Delgado was still employed, he had held the Helper position for 23 months which was the longest among the Helpers. **Ex. G, Helpers Not Promoted as of October 2019** [Ex. Q to Defendant's EEOC Position Statement].

16. The data Defendant submitted to the EEOC also shows that 20 out of 21 Crew Chiefs who were employed at that time were promoted within a year after they were hired, and promoted many of them within as little as 2-6 months. **Ex. H, Crew Chief List as of October 2019** [Ex. P to Defendant's EEOC Position Statement]. [1]Out of 22 terminated Crew Chiefs, 18 of them were promoted within one year. **Ex. I, Terminated Crew Chief List as of October 2019** [Ex. P to Defendant's EEOC Position Statement]

17. In the Company morning meetings, the administrative issues in the Company, employee's appearance, and customer complaints are discussed. Safety issues were not the main topics of the meetings and were not frequently discussed. **Ex. D, ¶ 10, Ex. E, ¶ 13.**

18. Attending meetings did not affect eligibility for promotion to the Crew Chief position. **Ex. D, ¶ 11**. Rather, Defendant considered presentability very important when promoting Helpers. Ex. According to Montalbono, "cleanliness or neatness of appearance, uniforms tucked in, clean shaven" is "very important" to the Company when promoting a helper to a crew chief because Defendant is a cleaning company. *Id*, ¶ 7. Defendant's Ex. F, Montalbano Transcript, 33:3-12.

19. According to Defendant, Helper's drive to want to be a Crew Chief, customer reviews on social media, and feedback from Crew Chiefs and dispatch are considered. *Id*., 33:13-21.

20. Plaintiff received several good customer reviews on a social media site. **Ex. J, Customer Reviews.** Crew Chiefs who worked with him stated that Mr. Delgado always did a good

---

[1] While the data shows Keith Upton, Jon Jacobsen, and Hernandez were promoted after 33, 22, and 26 months after they were hired, this is misstatement of the facts. Upton and Jacobsen were transferred to the mitigation department from other department and they were promoted to Crew Chiefs 8 and 5 months after the transfer. Hernandez were promoted within a month after hiring but Defendant included his previous employment experience with a different company to calculate the months it took for him to be promoted.

job. **Ex. D, ¶ 12, and Ex. E, ¶ 9**.Mr. Love specifically asked Plaintiff to be his Helper due to his good work. **Ex. E, ¶ 9**

21. There is not much difference between the job duties of a crew chief and a helper. And while the company preferred that crew chiefs drive the truck most of the time when the crews were dispatched, helpers did drive, and there were at least two Crew Chiefs who did not have driver's licenses and drivers assigned for them. **Ex. C, ¶ 7,** and **Ex. D, ¶ 8.**

22. It was a routine practice of Defendant to set Helpers for a failure when the it did not want to promote the Helpers for the reasons unrelated to their job performance. **Ex. D, ¶ 7.** It did this by selectively disciplining them for missing meetings. *Id.* For example, Defendant did not issue written warnings to Ozzy Mejia, Javier Perez, Julio Lopez, and Jason Dlugi even though their meeting records show that they were absent from or late for the meetings. **Ex. K, Crew Chief Meeting Records**, Def. Ex. E, Defendant's Response to Plaintiff's Interrogatories No. 4.

23. Jason Dlugi, who was late for the meeting on May 22, 2019, but was not disciplined at all, was later promoted to Crew Chief less than a year of his employment. Def. Ex. E, Defendant's Response to Plaintiff's Interrogatories Nos. 3 and 4. Defendant claims that Dlugi was promoted because of "[N]o missed meetings or disciplinary record as a helper." *Id.*, Response to Interrogatory No. 3-4).

24. Julio Lopez was absent from the meeting on May 15 and May 22, 2019 but was not given any write ups for those missed meetings. **Ex. K,** Def. Ex. E, Defendant's Response to Plaintiff's Interrogatories No. 4. Mr. Delgado received a written warning for missing the May 15, 2019 meeting. Def. Ex. J, [Doc # 26-10]

25. Mr. Delgado texted Trevor Madera on May 22, 2019 and asked why he was singled out and disciplined when Lopez missed the meeting as well. **Ex. L, Text messages with Madera.** Madera did not respond. *Id.*

26. Michael Love, who was a crew chief at Defendant, missed the meeting once or twice when he was a helper. **Ex. E, Love Affidavit, ¶ 6**. However, Love did not receive any written warning and was promoted to a crew chief 5 months after he was hired. *Id*., **¶ 3**. Defendant claims that Love did not miss any meetings as a helper. Def. Ex. E, Interrogatory Response No. 3-12).

27. After Mr. Delgado's seizure at the company meeting, the management became extremely concerned about the customer's perception of the company if Mr. Delgado was to have a seizure while he was out at a customer's house or a job site. At the following meeting, John Montalbano and Blake Veldman discussed this concern extensively. **Ex. E, ¶ 11.**

28. Plaintiff received his first write up on August 1, 2018, for being late for a meeting just after he started to ask about a raise and promotion to the Crew Chief position. Def. Ex. B, Delgado Transcript, 65:4-66:12, Def. Ex. G [Doc # 26-7]

29. Plaintiff received a second write up for being late for the meeting on October 18 and November 7, 2018, shortly after he asked Montalbano about the possibility of a raise and promotion again in October 2018. Defendant's Ex. F, Montalbano Transcript, 16:20-23, Def. Exs. H [Doc # 26-8] and I [Doc # 26-9]

30. Plaintiff filed his discrimination charge with the EEOC on May 24, 2019 for Defendant's failure to promote him to Crew Chief and failure to raise his pay because of his disability. **Ex. M, EEOC Charge**.

31. During this litigation, Defendant listed 30 alleged incidents of misconduct by Plaintiff as reasons why he was not promoted. Def. Ex. E, Response to Interrogatory No. 12. However, in this litigation, Defendant stopped claiming that Plaintiff was not promoted because of his inability to drive even though it was one of the reasons claimed to Mr. Delgado in person and during the EEOC procedure. **Ex. A, p. 18**, **Ex. B, EEOC Position Statement, pp. 5, 11, Ex. C, ¶ 3.**

32. During his employment, Plaintiff was not disciplined for most of the alleged violations identified in the interrogatory response and these violations were not included in his personnel file. His personnel file includes only seven write-ups, all of them issued after Defendant became aware of Plaintiff's disability. **Ex. N, Plaintiff's Personnel File.** After filing an EEOC charge, Plaintiff received three write ups within a month. ***Id.***

33. Plaintiff regularly reported his hours via text to the management through Trevor Madera or John Montalbano. **Ex. A**, **Text Messages between Plaintiff and Montalbano, page 108-110, 112-114, Ex. L, Text messages with Madera**. At no time, was Plaintiff warned that it was a violation of company policy. Nor was he disciplined. ***Ids*.**, **Ex. C**, **¶ 5, Ex. N** Defendant actually disciplined other Helpers who failed to clock in and out or failed to report hours. **Ex. O, Helper Time Record Violations.**

34. Plaintiff was not warned or disciplined for using inappropriate language or supposedly not following directions during his employment. **Ex. C, Delgado Affidavit, ¶ 6.** During Plaintiff's employment, Montalbano never told him that he was not promoted because he missed the company meetings. Even though Plaintiff asked Montalbano what he could do or improve to be promoted, he never received any straightforward response. ***Id*., ¶ 4.**

35. When a Helper could not work on a certain day, he could find and send in a replacement. There is no pre-authorized on call list for replacement. It was not the Helper's responsibility to look for a replacement. Trevor Madera, Operation Manager, was the one who was responsible for finding a replacement. **Ex. D, ¶ 9, Ex. E, ¶14.**

36. Defendant admitted that Plaintiff was not in possession of the alleged authorized on-call list when he was disciplined for not utilizing the list. Def. Ex. D, 30(b)(6) Deposition, 68:17-21.

37. It was the general opinion and consensus among the crew chiefs that Plaintiff was not being promoted because of his disability. **Ex. E, Love Affidavit**, ¶ 12.

38. When asked to give specific information as to Plaintiff's inappropriate language use, the 30(b)(6) witness testified that it was inappropriate to text Montalbano that "I think I broke my ass bone" after he slipped and fell at the company premises. Def. Ex. D, 34:7-23.

39. The 30(b)(6) witness also testified that she regarded Plaintiff's alleged refusal to go to a company assigned clinic instead of his own doctor for a fitness-for-duty certification as an example of him not following directions. *Id.* 36:19-37:18.

40. Contrary to Defendant's claim, there was at least one more Helper beyond the other two who was paid $16 per hour according to Defendant's records submitted to the EEOC. Robert Ocasio received a raise from his initial $15 per hour pay and was paid $16 per hour. **Ex. P, Defendant's Helper Pay Record Submitted to EEOC** [Ex. R to EEOC Position Statement]

Respectfully submitted:
Anthony Delgado
By: ___/s/ Heewon O'Connor
One of His Attorneys

Heewon O'Connor
Kevin F. O'Connor
O'Connor | O'Connor, P.C.
110 E. Schiller St., Ste. 212
Phone:      630-903-6397
Fax: 630.658.0336

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2021, Plaintiff's Response to Defendant's R 56.1 Statement and Statement of Additional Facts was served this day on all counsel of record via transmission by electronic mail; all parties to this action being authorized to, and currently utilizing, the CM/ECF system for the Northern District of Illinois.

/s/ Heewon O'Connor.
Heewon O'Connor
O'Connor | O'Connor, P.C.
110 E. Schiller St., Ste 212
Elmhurst, IL 60126
Office 630-903-6397
Fax. 630-658-0336

## Service List

Mark Walter Guest        mwg@doherty-progar.com, mail@doherty-progar.com

Michael Robert Luchsinger        mail@doherty-progar.com, mrl@doherty-progar.com