IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY DELGADO,

                  Plaintiff,

        v.                    Case No. 20 C 3271

POWER DRY CHICAGO, INC. d/b/a     Judge Harry D. Leinenweber
CHICAGO WATER AND FIRE
RESTORATION,

                  Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Anthony Delgado brings this action against his former employer, Defendant Power Dry Chicago, Inc. d/b/a Chicago Water and Fire Restoration ("Power Dry") alleging violations of the Americans with Disabilities Act ("ADA" or the "Act"), 42 U.S.C. §§ 12101 and the Illinois Human Rights Act ("IHRA"). Delgado alleges two discriminatory actions under each law, for a total of four counts. Specifically, Delgado alleges: (1) Power Dry failed to promote Delgado because of his disability and (2) Power Dry denied Delgado's request for a raise because of his disability. Power Dry has moved for summary judgment on all four counts. For the reasons set forth herein, Power Dry's Motion for Summary Judgment (Dkt. No. 24) is denied as to Counts I and II and granted as to Counts III and IV.

## I.  BACKGROUND

The following facts are drawn primarily from the exhibits submitted in support of the Parties' Local Rule 56.1 statements instead of the statements themselves. "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner: it is not intended as a forum for factual or legal argument." *Malec v. Sanford,* 191 F.R.D. 581, 585 (N.D. Ill. 2000). The submissions in support of this Motion for Summary Judgment failed to fulfill this purpose. Both Parties' submissions failed to articulate some of the most basic facts necessary for resolution of the claims, including Plaintiff's dates of employment and the relevant duties of the positions at-issue in this litigation. As a result, the Court was required to spend time reviewing each of the submitted exhibits in order to resolve this motion for summary judgment. While the Court cited to the Local Rule 56.1 statements where possible, for many facts this was simply not possible. In addition, Defendant filed a reply to Plaintiff's Response to Defendant's Statement of Facts. Local Rule 56.1 prohibits such a filing without leave of the Court. *See* L.R. 56.1(f). Because Defendant failed to seek leave of the Court, for the purpose of resolving this Motion the Court has disregarded Defendant's reply submission.

### A. Power Dry

Power Dry provides water and fire damage restoration services to commercial and residential customers in the Chicagoland area. Chicago Water and Fire, https://chicagowaterandfire.com/ (last visited Nov. 17, 2021). Power Dry's services "commonly include [] clean-up and restoration after fires, flooding, [and] burst pipes." (Answer ¶ 10, Dkt. No. 13.) Power Dry's services are performed by employees known as "Mitigation Apprentices" or "Helpers." (Pl.'s Resp. to Def.'s Stmt. of Facts ("PSOF") ¶ 19, Dkt. No. 30.) The starting wage for Power Dry Helpers is $15 per hour. (Helper Wage List, Pl.'s Stmt. of Facts, Ex. P, Dkt. No. 30-16.)

The Helpers on each Power Dry job are supervised by a "Crew Chief." (Kelly Dep. 51:9-11, Def.'s Stmt. of Facts, Ex. D., Dkt. No. 26-4.) Power Dry's Vice President Kseniya Kelly testified that in addition to managing the Helpers, Crew Chiefs are "personally responsible for all documentation, for communication with the project manager, for communication with the customer, [and the] final walk through with the customer." (*Id.* at 51:2-8.) Crew Chiefs are also responsible for "the [company] vehicle and all the equipment that is on the vehicle." (*Id.* 51:12-14.) Crew Chiefs are not paid an hourly salary and instead receive a commission from

each job they complete. (Answer ¶ 12.) Crew Chiefs "earn []
substantially more" than Helpers. (*Id.*)

Helpers that meet Power Dry's expectations are considered
for promotion to Crew Chief. (PSOF ¶¶ 27–28.) Power Dry's General
Manager John Montalbano testified that the timing of promotions
depends on the need for Crew Chiefs based on the amount of work
the company has at a given time. (Montalbano Dep. 32:16–33:2.)
While Power Dry does not have any written policies or standards
for the promotion from Helper to Crew Chief, the Company reported
that it evaluates a Helper's employment and personnel record,
eagerness, drive, responsibility, and recommendations from other
Crew Chiefs. (PSOF ¶¶ 27–28.) Montalbano stated that Power Dry
also reviews a Crew Chief candidate's disciplinary record.
(Montalbano Dep. 33:3–5.) Vice President Kelly testified that
Power Dry does not consider length of employment when evaluating
Helpers for promotion to Crew Chief. (Kelly Dep. 31:23–32:1.)
During the period 2017 to 2019 Power Dry promoted Helpers to Crew
Chief in as little as 1–3 months and as many as 22 months.
(Promotion Summary, Pl.'s Stmt. of Facts, Ex. F, Dkt. No. 30-6.)
The median time to promotion during this period was 6.5 months.
(*Id.*)

Power Dry maintains an Employee Handbook which contains the
company's policies, procedures, guidelines, and requirements for

employment. (Employee Handbook at 5, Def.'s Stmt. of Facts, Ex. A, Dkt. No. 26-1.) For example, Power Dry requires its employees to "act in a professional manner and extend the highest courtesy to co-workers . . . and Customers." (*Id.* at 38.) Power Dry prohibits employees from creating "an intimidating, hostile or offensive working environment by . . . using vulgar, kidding, or demeaning language." (*Id.* at 23.) Helpers are required to report their time worked by clocking in and out through a third-party software application downloaded to the employee's mobile device. (*Id.* at 16.) Employees that failed to clock in or out are required to email Power Dry's Accounts Payable personnel within 24 hours of the error. (*Id.*) At the discretion of Power Dry Management, employees that report inaccurate hours or fail to report hours at all may be subject to immediate dismissal. (*Id.*)

Power Dry also requires its Crew Chiefs and Helpers to "show up for work when on duty" and "show up for work on time." (*Id.* at 52.) Power Dry tracks attendance, absences, and late arrivals through employee timesheets and written records in an employee's file. (*Id.*) Absences are categorized as either excused or unexcused. (*Id.* at 57.) An absence is excused when it is caused by a documented illness, a documented medical emergency, or the approval of unpaid time off. (*Id.*) An absence is unexcused when the employee does not "show [] up for work when on duty and

scheduled to either provide Customer services or attend any production meeting." (*Id.*) Helpers and Crew Chiefs are deemed tardy for work when they arrive more than 10 minutes late. (*Id.* at 59.) According to the Employee Handbook, at the discretion of Power Dry management an unexcused absence or late arrival can result in discipline, including a write-up, docked pay, suspension without pay, or immediate dismissal. (*Id.* at 62.)

### B. Delgado's Employment with Power Dry

Plaintiff Delgado was diagnosed with epilepsy at age fifteen. (Delgado Dep. at 19:3-20:13, Def.'s Stmt. of Facts, Ex. B, Dkt. No. 26-2.) Delgado's epilepsy causes him to have headaches and seizures which vary in length and intensity. (*Id.* at 20:15-21:7.) Because the onset of his seizures is unpredictable, Delgado is unable to obtain a driver's license or ascend heights using things like a ladder or scaffolding. (*Id.* at 21:11-21; 71:9-10.)

In July 2017, shortly after he graduated from high school, Power Dry hired Delgado as an on-call Helper. (Answer ¶ 7, Dkt. No. 13; Delgado Dep. 25:19-26:12.) Approximately three months later, Delgado became a full-time Helper. (PSOF ¶¶ 19-20.) As both an on-call and a full-time employee, Delgado was paid Power Dry's starting Helper salary of $15 per hour. (*Id.* ¶¶ 22-23.) Approximately one year after being hired, on July 30, 2018, Delgado signed an acknowledgement attesting that he had both received a

- 6 -

copy of and familiarized himself with the contents of the Power Dry Employee Handbook. (Employee Handbook at 79.) By signing the acknowledgement, Delgado agreed to comply with the policies, procedures, guidelines, and requirements in the Employee Handbook and certified that he understood the consequences of non-compliance. *Id.*

Delgado did not disclose the fact of his epilepsy when he was hired by Power Dry. (PSOF ¶ 48.). In March 2018, Delgado suffered a seizure during a company meeting, making Power Dry aware of his diagnosis for the first time. (*Id.*) Former Power Dry Crew Chief Michael Love testified that following this incident Power Dry Management discussed concerns "about the customer's perception of the company if Mr. Delgado had a seizure while he was out at a customer's house or a job site." (Love Decl. ¶ 11, Pl.'s Stmt. of Facts, Ex. E, Dkt. No. 30-5.)

### 1. *Disciplinary Issues*

Power Dry's records of Delgado's employment show inconsistent adherence to the Employee Policy. (Def.'s Resp. to Interrog. at 14, Def.'s Stmt. of Facts, Ex. E, Dkt. No. 26-5.) For example, Delgado regularly failed to clock in and out or report his hours in a timely manner. (*Id.*; *see also, e.g.,* Montalbano and Delgado Text Messages at 7–9, 12, Pl.'s Stmt. of Facts, Ex. A, Dkt. No. 30-1.) Power Dry also alleges that Delgado used inappropriate

language and failed to follow directions while at customer job sites. (Def.'s Resp. to Pl.'s Stmt. of Facts ("DSOF") ¶ 34, Dkt. No. 32; Kelly Dep. 66:1–2; Montalbano Dep. 36:21–23.) Delgado was not, however, disciplined for any of these alleged violations. (DSOF ¶¶ 33–34.)

Delgado also had a significant number of unexcused absences and late arrivals. On April 4, 2018, December 17, 2018, February 20, 2019, September 9, 2019, and October 30, 2019 Delgado missed scheduled company meetings. (Def.'s Resp. to Interrog. at 14–16.) Delgado was not written up for these unexcused absences. From August 2018 through October 2019, Delgado received six disciplinary write-ups, all for attendance-related violations of the Employee Handbook. On August 1, 2018, November 7, 2018 and October 23, 2019 Delgado was written up for arriving late to a company meeting and for each incident received a warning. (8/1/18 Delgado Write-Up, Def.'s Stmt. of Facts, Ex. G, Dkt. No. 26-7; 11/7/18 Delgado Write-Up, Def.'s Stmt. of Facts, Ex. I, Dkt. No. 26-9; 10/23/19 Delgado Write-Up, Def.'s Stmt. of Facts, Ex. L, Dkt. No. 26-12.) On October 18, 2018 and May 15, 2019 Delgado was written up for failing to attend a company meeting and for each incident received a warning. (10/18/18 Delgado Write-Up, Def.'s Stmt. of Facts, Ex. H, Dkt. No. 26-8; 5/15/19 Delgado Write-Up, Def.'s Stmt. of Facts, Ex. J, Dkt. No. 26-10.) On September 14,

2019 Delgado was written up for failing to work his scheduled shift and received a warning. (9/14/19 Delgado Write-Up, Def.'s Stmt. of Facts, Ex. K, Dkt. No. 26-11.)

### 2. *Requests for a Raise and Promotion*

Delgado testified that he had a conversation with Power Dry's General Manager John Montalbano in mid-2018 about a promotion to Crew Chief and a raise. (Delgado Decl. ¶ 2, Pl.'s Stmt. of Facts, Ex. C, Dkt. No. 30-3.) Montalbano, however, testified that he never had a face-to-face conversation with Delgado regarding a promotion. (Montalbano Dep. 21:2-4, Def.'s Stmt. of Facts, Ex. F, Dkt. No. 26-6.) In February 2019, Delgado approached Montalbano about the topic through text messages. (Montalbano and Delgado Text Messages at 18.) In response to the text message request, Montalbano responded that his "one thing is not about money it's about the company." (*Id.*) Delgado responded asking for clarification on what he was doing wrong or what he could improve in order to be eligible for a promotion or a raise. (*Id.*) Montalbano did not respond. (*Id.*)

### 3. *Delgado's Separation from Power Dry*

Delgado continued working as a Helper until December 6, 2019. (Answer ¶ 7.) After leaving Power Dry, Delgado worked for an

electrician and then moved to his current position as a pre-loader for the United Parcel Service ("UPS"). (Delgado Dep. 17:10–18:4.)

### E. Procedural Posture

After receiving a right to sue letter from the EEOC, Delgado filed the present action on June 3, 2020. (Dkt. No. 1.) Delgado filed an Amended Complaint on August 12, 2020. (Dkt. No. 12.) Power Dry answered the Amended Complaint on August 28, 2020. (Dkt. 13.) On June 24, 2021, Power Dry moved for summary judgment on all counts. (Dkt. No. 24.) The briefing now concluded; the Court considers the Motion.

## II.  LEGAL STANDARD

Summary judgment is appropriate if there is "no genuine dispute of material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" when identified by substantive law as affecting the outcome of the suit. *Bunn v. Khoury Enters., Inc.,* 753 F.3d 676, 681 (7th Cir. 2014). An issue is genuine when the evidence presented is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 681–82. When reviewing the record on a summary judgment motion, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris,* 550 U.S. 372, 378 (2007). If, however, the factual record cannot support a rational trier of fact to find for the

non-moving party, summary judgment is appropriate. *Bunn,* 753 F.3d at 682.

### III. <u>DISCUSSION</u>

Delgado argues that Power Dry violated the ADA and the IHRA by failing to promote him from Helper to Crew Chief and denying him a raise. "An IHRA claim for disability discrimination is analyzed under the same framework as an ADA claim." *Winkfield v. Chicago Transit Auth.,* 435 F.Supp.3d 904, 909 (N.D. Ill. 2020). For these reasons the Court will analyze both the ADA and IHRA claims under the ADA framework.

### A. **Qualified Individual with a Disability**

The ADA prohibits employers from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A threshold question for these ADA claims is whether Delgado is a "qualified individual with a disability" and thus protected by the ADA. *Id.* For the reasons set forth below, there remains a question of material fact whether Delgado was a qualified individual with a disability under the ADA.

Under the ADA "disability" is defined in three ways: "[1] a physical or mental impairment that substantially limits one or more major life activities of such individual; [2] a record of such an impairment; or [3] being regarded as having such an impairment." 42 U.S.C. § 12102(1). For Delgado to fall under the

- 11 -

first two prongs of the ADA's definition of "disability," he must first present evidence that he has a physical or mental impairment or a record of such impairment and that such impairment "substantially limits one or more major life activities." 42 U.S.C. § 12102(1). The Parties do not dispute that Delgado suffers from epilepsy. ADA regulations state that in terms of limiting a major life activity "it should be easily concluded that . . . epilepsy substantially limits neurological function." 29 C.F.R. § 1630.2(j)(3)(iii). The Court therefore finds that Delgado has an impairment, epilepsy, that limits the major life activity of neurological function and thus has a disability as defined by the ADA.

Having concluded that Delgado has a disability as defined under the ADA, the Court turns to whether Delgado is a "qualified individual." The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Power Dry argues that Delgado's history of disciplinary incidents prevents Delgado from being a qualified individual under the ADA. Specifically, Power Dry points to Delgado's disciplinary issues related to attendance, time reporting, and inappropriate language. Delgado argues that the identified disciplinary incidents are

immaterial to the determination because they are irrelevant or not credible. He further argues that there is little difference between the work performed by a Helper and a Crew Chief. Delgado argues that his successful employment as a Helper for more than two years is evidence of the success he would have had as a Crew Chief. Delgado argues that the Court can find he was a successful Helper because he had good reviews from his supervisors and customers.

The Court "may consider evidence of an employee's poor attitude, careless behavior, deficient work performance, and noncompliance with workplace rules in determining whether the employee is a 'qualified individual' under the ADA." *Payton v. Jewel Food Stores, Inc.,* 120 F.Supp.3d 794, 799 (N.D. Ill. 2015). The Seventh Circuit has repeatedly recognized violations of workplace rules as grounds for finding that the employee was not a qualified individual. *See, e.g., Budde v. Kane Cnty. Forest Pres.,* 597 F.3d 860, 863 (7th Cir. 2010) ("Budde was not 'qualified' to perform his job as police chief, based on his failure to comply with workplace rules."); *Palmer v. Cir. Ct. of Cook Cnty., Ill.,* 117 F.3d 351, 352 (7th Cir. 1997) ("The Act protects only 'qualified' employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one.") The Seventh Circuit's jurisprudence in this area should not, however, be read so narrowly that "any

- 13 -

violation of a workplace rule constitutes disqualifying conduct as a matter of law." *Needham v. McDonald,* 2017 WL 5171197, at *5 (N.D. Ill. Nov. 8, 2017), *order clarified on reconsideration,* 2018 WL 11199007 (N.D. Ill. Feb. 1, 2018). Instead, the Court must determine whether Delgado's violations of the Employee Handbook impacted his ability to perform the essential functions of his job. *Id.* The Court therefore considers each category of alleged misconduct below.

The Power Dry Employee Handbook requires employees to arrive on time and work all scheduled shifts, unless otherwise excused. It is undisputed that "[a]n employer is generally permitted to treat regular attendance as an essential job requirement." *Basden v. Pro. Transp., Inc.,* 714 F.3d 1034, 1037 (7th Cir. 2013). Delgado repeatedly violated Power Dry's attendance policies between April 2018 to October 2019 by: (1) arriving late to company meetings three times, (2) missing a company meeting seven times, and (3) failing to work a scheduled shift once. While this is far from a perfect attendance record, Power Dry only formally disciplined Delgado six times, each with only a written warning. On this record, the Court cannot conclude that Delgado's attendance issues prevented him from performing the essential functions of his job. *Cf. Preddie v. Bartholomew Consol. Sch. Corp.,* 799 F.3d 806, 814 (7th Cir. 2015) (concluding 23 absences in a school year prevented

- 14 -

plaintiff from performing the essential functions of his teaching job).

The Power Dry Employee Handbook also sets forth a process for clocking in and out, as well as correcting any time submission errors. Text messages between Delgado and Montalbano are replete with examples of Delgado submitting time after the deadline and not in accordance with the processes set forth in the Employee Handbook. Even so, Delgado was never written up for these time submission infractions and Power Dry admits he was never reprimanded for this misconduct. To the contrary, Power Dry allowed Delgado to submit or correct his time outside the established processes for the duration of his employment. At this stage, the Court cannot conclude that Delgado's time submission violations reflected an inability to perform the essential functions of a Crew Chief.

Finally, the Power Dry Employee Handbook prohibits the use of vulgar language which creates a hostile work environment and requires employees to extend the highest courtesy to co-workers and customers. Montalbano and Kelly both testified that Delgado cursed while working. This testimony, however, focused on a general concern about cursing on the job and failed to point to any specific incidents. As with the time tracking incidents, the severity of this issue is undermined by the fact that Delgado was

never reprimanded for his behavior. At this stage, the Court cannot conclude that any issues with Delgado's alleged vulgar language were so pervasive that he was unable to perform the essential functions of a Crew Chief.

Based on the record at summary judgment and taking all inferences in favor of Delgado, a reasonable jury could conclude that none of the alleged disciplinary issues were so pervasive that Delgado was unable to perform the essential functions of a Crew Chief. Because there are open questions of material fact on the threshold question of whether Delgado is a "qualified individual with a disability" the Court now turns to the merits of each claim.

## B. Failure to Promote (Counts I and II)

Delgado contends that Power Dry failed to promote him on the basis of his disability, in violation of the ADA and IHRA. To establish this claim, Delgado must show that "(1) he is disabled, (2) he was qualified to perform the essential functions of his job with or without a reasonable accommodation, and (3) his disability was the "but for" cause of an adverse employment action." *Scheidler v. Indiana,* 914 F.3d 535, 541 (7th Cir. 2019). Elements 1 and 2 encompass the qualified individual with a disability analysis covered in Section III.A, *supra*. This analysis therefore focuses on the third element, and whether the record establishes a "but

for" causal connection between Delgado's epilepsy and Power Dry's failure to promote him to Crew Chief. The ultimate question for the third element of Delgado's claim is whether there is evidence that "would permit a reasonable factfinder to conclude that [Delgado's disability] . . . caused the . . . adverse employment action*." Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016). Viewing the record in the light most favorable to Delgado, the Court concludes that such evidence exists.

The Seventh Circuit has previously recognized that being denied a promotion is an adverse employment action. *Gibbs v. Gen. Motors Corp.,* 104 F. App'x 580, 583 (7th Cir. 2004). In its Motion for Summary Judgment, Power Dry argues that it was Delgado's history of disciplinary issues and violations of the Employee Handbook that caused the company not to promote him to Crew Chief. Where the employer offers a legitimate non-discriminatory reason for the adverse action the burden shifts to the employee to provide evidence that the reason is pretextual. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508,* 846 F.3d 216, 225 (7th Cir. 2017). "A plaintiff can establish pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Rand v. CF Indus., Inc.,* 42 F.3d 1139, 1145 (7th Cir.1994). Here, Delgado argues that Power Dry is overstating his disciplinary

issues and this reasoning should not be given weight on summary judgment. Viewing the record in the light most favorable to Delgado, the Court concludes that Power Dry's reliance on Delgado's disciplinary issues is undermined by other evidence in the record and unworthy of credence at this stage.

In March 2018, Power Dry became aware of Delgado's epilepsy following a seizure during a company meeting. Love's testimony is that following this incident Power Dry management discussed their concerns "about the customer's perception of the company if Mr. Delgado had a seizure while he was out at a customer's house or a job site." (Love Decl. ¶ 11.) Power Dry denies these concerns and instead focuses on Delgado's history of disciplinary issues as the reason for denying him a promotion. During his more than two-year employment, Power Dry formally disciplined Delgado just six times with written warnings for attendance-related violations of the Company Handbook. The remainder of Delgado's alleged disciplinary issues went unaddressed by Power Dry management. This was the case even when Delgado texted Montalbano regarding becoming Crew Chief and expressly asked what he could do to improve and be eligible for the promotion. Indeed, the only contemporaneous statement from Montalbano regarding Delgado's promotion to Crew Chief is that his "one thing is not about money it's about the company." (Montalbano and Delgado Text Messages at 18.) This vague statement is subject

to interpretation, an action not appropriate for the Court on summary judgment. *Ashman v. Barrows,* 438 F.3d 781, 784 (7th Cir. 2006) ("It seems clear that this is a case in which summary judgment is inappropriate. The record is replete with incidents which are open to interpretation.")

Based on the record before the Court, Power Dry's failure to address the vast majority of the alleged disciplinary incidents in the record could allow a reasonable juror to conclude that the identification of these incidents is pretext and Power Dry based its decision not to promote Delgado on his epilepsy and fears that he would suffer a seizure while at a client site. For these reasons, summary judgment is denied as to Counts I and II.

### C. Denial of a Raise

Delgado alleges that Power Dry denied him a raise on the basis of his disability in violation of the ADA and the IHRA. The elements for the raise denial claims are the same as the failure to promote claims; Delgado must show that "(1) he is disabled, (2) he was qualified to perform the essential functions of his job with or without a reasonable accommodation, and (3) his disability was the "but for" cause of an adverse employment action." *Scheidler,* 914 F.3d at 541. Elements one and two encompass the qualified individual with a disability analysis covered in Section III.A, *supra*. This analysis therefore focuses on the third element,

whether Delgado's epilepsy was the "but for" cause of Power Dry denying his request for a raise. The ultimate question for the third element of Delgado's claim is whether there is evidence that "would permit a reasonable factfinder to conclude that [Delgado's disability] . . . caused the . . . adverse employment action." *Ortiz,* 834 F.3d at 765. Viewing the record in the light most favorable to Delgado, the Court concludes that no such evidence exists.

The Seventh Circuit has previously concluded that being denied a raise is an adverse employment action. *Farrell v. Butler Univ.,* 421 F.3d 609, 614 (7th Cir. 2005). In its Motion for Summary Judgment, Power Dry argues that it was the company's policy not to offer raises to Helpers. Evidence supporting such a policy includes a list of 75 Helpers, including Delgado, hired from December 5, 2015 through August 29, 2019, 74 of whom started at a wage of $15 per hour. (Helper Wage List at 1-2; Kelly Decl. ¶ 5, Def.'s Stmt. of Facts, Ex. M, Dkt. No. 32-1 (explaining that the Helper Wage List "incorrectly shows that Ocasio started at $15 per hour").) Just three Helpers—Robert Ocasio, Matthew Nelson, and Jonathan Coats—received a raise to $16 per hour. (Helper Wage List at 1-2.) As with above, where the employer offers a legitimate non-discriminatory reason for the adverse action the burden shifts to the employee to provide evidence that the reason is pretextual.

*David,* 846 F.3d at 225. Here, Delgado argues that the fact that Ocasio, Nelson, and Coats were given raises to $16 per hour contradicts the existence of any company policy to pay all Helpers $15 per hour. This, according to Delgado, is enough to survive summary judgment. The Court disagrees.

Ocasio, Nelson, and Coats each possessed a special set of skills or certification relevant to the restoration industry. Ocasio started at $16 per hour because he had significant carpentry skills and was making $18 per hour at his prior job. (Kelly Decl. ¶ 5.) Nelson received a raise because he is certified to operate a forklift, which is a specialized skill needed by Power Dry. (PSOF *Id.* ¶ 24.) Coats received a raise to $16 per hour because he previously owned a restoration company and therefore has extensive expertise and training in mitigation services. (*Id.*) In contrast, this was one of Delgado's first jobs out of high school. Nothing in the record even suggests that Delgado had any special training, certifications, or significant experience or skills necessary for the mitigation industry. Consequently, the record contains no evidence that Delgado should have been afforded the same treatment as Ocasio, Nelson, and Coats. Instead, Power Dry properly paid Delgado the same wage it paid 71 other Helpers.

For these reasons, even if the first two elements resolve in his favor, Delgado has not presented evidence from which a

reasonable factfinder could conclude that Power Dry denied him a raise on the basis of his disability. The Court therefore grants Power Dry's Motion for Summary Judgment as to Counts III and IV.

## IV.   <u>CONCLUSION</u>

For the reasons stated herein, Power Dry's Motion for Summary Judgment (Dkt. No. 24) is granted in part and denied in part. Summary judgment is denied as to Counts I and II and granted as to Counts III and IV.

**IT IS SO ORDERED.**

_____
       Harry D. Leinenweber, Judge
       United States District Court

Dated: 12/17/2021

- 22 -